## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| MICHAEL CARDINALE, on behalf of himself and all those similarly situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>VALKRE SOLUTIONS, INC., and JERRY D. ALDERMAN individually, )<br><br>Defendants. ) | Case No.   2017-cv-03406<br><br>Judge:<br>Magistrate: |

## COMPLAINT

Plaintiff, MICHAEL CARDINALE ("CARDINALE"), on behalf of himself and all those similarly situated, by and through his attorneys, L. STEVEN PLATT and ROBBINS SALOMON & PATT, LTD, pursuant to the Fair Labor Standards Act ("FLSA") 29 U.S.C. § 201 *et seq.,* the Illinois Minimum Wage Law ("IMWL"), 820 ILCS § 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.,* and pursuant to Illinois common law, complaining against Defendants, VALKRE SOLUTIONS, INC., ("VALKRE") and JERRY D. ALDERMAN ("ALDERMAN") (collectively the "DEFENDANTS") states as follows:

## NATURE OF PLAINTIFFS' CLAIMS

1.     This lawsuit arises under the FLSA, the IMWL and the IWPCA, and under state common law breach of contract claims due to the DEFENDANTS' failure to pay agreed wages, minimum wages, overtime wages for work performed in excess of forty (40) hours in a given work week, failure to pay bonus, and failure to reimburse

CARDINALE for expenses incurred for business purposes, charged to clients and collected from clients, all pursuant to an agreement made between CARDINALE and DEFENDANTS to pay such sums to CARDINALE in the course of his employment by DEFENDANTS.

2.      CARDINALE also brings this action on behalf of himself and all others similarly situated under the federal rules and the FLSA.

## THE PARTIES

3.      Plaintiff CARDINALE is United States citizen, born and raised in the United States, and he resides in this jurisdictional district.

4.      The Plaintiffs similarly situated to CARDINALE are believed to all live in this jurisdictional district, and represent a putative class of individuals who were also account representatives like CARDINALE who worked at some point over the past 10 years, for the DEFENDANTS.

5.      A consent to proceed with this action as a collective and class action is attached hereto as Exhibit B.

6.      Defendant VALKRE is a Delaware corporation authorized to do business in and in good standing in Illinois, engaging in management consulting services, with its headquarters located at 220 North Green Street, Chicago, IL 60607, located in this jurisdictional district.

7.      Defendant ALDERMAN resides in this jurisdictional district and is the owner and founder of DEFENDANT VALKRE.

8.      The acts complained of occurred because of CARDINALE being an

employee of the DEFENDANTS so all of the acts complained of occurred in this jurisdictional district.

9.     In the prior ten years, CARDINALE was employed by the DEFENDANTS as an "employee" as defined by the FLSA, 29 U.S.C. § 203(e)(1), the IMWL, 820 ILCS § 105/3(d) and the IWCPA, 820 ILCS § 115/2.

10.     DEFENDANTS were CARDINALE'S "employer" as that term is defined by the FLSA, 29 U.S.C. § 203(d), the IMWL, 820 ILCS § 105/3(c) and the IMWL, 820 ILCS § 105/3(d) and the IWCPA, 820 ILCS § 115/2.

11.     At all times relevant, DEFENDANTS individually and or collectively were an "enterprise" as defined by § 3(r)(1) of the FLSA, 29 U.S.C. § 203(r)(1). *See, also* 29 C.F.R. § 779.214.

12.     At all times relevant, DEFENDANTS individually and or collectively were an enterprise with a "business purpose," as defined by § 3(r)(1) of the FLSA, 29 U.S.C. § 203(r)(1). *See, also* 29 C.F.R. § 779.214.

13.     At all times relevant, Defendants had an annual dollar volume ("ADV") of "sales made or business done" of $500,000 or more within the meaning of § 3(s)(1)(A), 29 U.S.C. § 203(s)(1)(A).

14.     At all times relevant, DEFENDANTS annually had at least two or more employees engaged in commerce, within the meaning of § 3(s)(1)(A), 29 U.S.C. § 203(s)(1)(A).

15.     During the course of CARDINALE'S employment by DEFENDANTS, CARDINALE'S job included engaging in the sending and receiving of out-of-state

remittances, letters, contracts, and the like, and involved the regular and recurrent use of the internet, interstate mails, telephone, and similar agencies for communication across state lines, and international lines thus engaging him in interstate commerce in the performance of his job with DEFENDANTS.

16. CARDINALE engaged in recordkeeping activities, incident to the sending and receiving of such subjects of interstate commerce, which was performed by office and clerical employees of DEFENDANTS and by CARDINALE himself, and then transmitted or discussed by CARDINALE with clients through the use of implements of communication across state lines, and international lines engaging him in interstate commerce in the performance of his job with DEFENDANTS.

17. In addition, even if CARDINALE himself had not engaged in interstate commerce in the performance of his job, the activities engaged in by CARDINALE while working for DEFENDANTS were so closely related to interstate movement and the acts of interstate commerce engaged in by others that they are "regarded as" engaging him in interstate commerce in the performance of his job with DEFENDANTS.

18. Defendant ALDERMAN at all times relevant was and is the owner and controlling shareholder and or managing member of Defendant VALKRE and all entities that are related to controlled by VALKRE, if any.

19. Defendant ALDERMAN is involved in the day to day business operations of the VALKRE and, among other things, is involved in corporate development, and obtaining and servicing clients and customers, obtaining new customers and leads on new customers, and clients, is involved in promoting the company and himself as related to

the company known as VALKRE as its founder and owner, he hires and fires employees, directs and supervises the work of employees, signs checks books and records on the corporation's behalf, he makes decisions regarding who to put on the payroll who to take off the payroll, who to pay as an independent contractor, who to pay as an employee, how much commission to pay people, how much salary to pay people, how much if any, fringe benefits to give employees, what title to give employees, what job responsibilities and duties to give employees, he signs tax returns, payroll tax returns, quarterly tax returns, resolves audits regarding VALKRE, he resolves VALKRE'S corporate audits and financial records, provides company financial information to VALKRE'S accountants and auditors, provides VALKRE'S accountants and auditors with access to whatever company financial records he chooses to share with them, he makes all VALKRE financial decisions, all decisions on what to pay employees, when to pay them and whether to pay or not pay employees compensation and benefits, whether or not to pay employees at all, and whether or not to reimburse employees for expenses incurred performing company business, even after such expenses are billed to the clients and received from the clients. In sum, ALDERMAN is involved with every single aspect of the day-to-day business that is VALKRE.

20.    No one at VALKRE besides ALDERMAN has the authority to hire and fire employees other than ALDERMAN.

21.    No one at VALKRE besides ALDERMAN has the authority to give raises, bonuses or determine compensation other than ALDERMAN.

22.    No one at VALKRE besides ALDERMAN has the final say with regard

to employee evaluations.

23.     No one at VALKRE besides ALDERMAN has the ability to effectively recommend any policy change or employment decisions.

24.     During his employment with VALKRE, CARDINALE, in the performance of his job was not engaged in activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

25.     In the course of performing his job with DEFENDANTS, CARDINALE did not in general, exercise discretion and independent judgment involving the comparison and the evaluation of possible courses of conduct and acting or making a decisions after the various possibilities had been considered.

26.     During the course of performing his job with DEFENDANTS, CARDINALE did not exercise discretion and independent judgment with respect to matters of significance to DEFENDANTS.

27.     During the course of his employment by the DEFENDANTS, CARDINALE was thereby not exempt from the overtime, minimum wage, or wage and bonus provisions of the FLSA, 29 U.S.C. §201, *et seq.* the IMWL, 820 ILCS 105/1 *et seq.* or the IWCPA, 820 ILCS 115/1 *et seq.*

## JURISDICTION AND VENUE

28.     Jurisdiction of this Court is invoked pursuant to the FLSA, 29 U.S.C. § 201 *et seq.*, the IMWL, 820 ILCS § 105/1 *et seq.* and the IWCPA, 820 ILCS § 115/1, *et seq.*

29.     Therefore, jurisdiction of this Court is invoked under this Court's federal question jurisdiction as set forth at 28 U.S. Code § 1331.

30.     CARDINALE requests that this Court assert jurisdiction over his pendent state law claims under this Court's supplemental jurisdictional authority pursuant to 28 U.S. Code § 1367, as the state law claims are so related to the claims in this action within the original jurisdiction of this Court, that they form part of the same case or controversy under Article III of the United States Constitution.

31.     Jurisdiction of this court is further invoked pursuant to Fed.R.Civ.P. 23, and 29 U.S.C. §216(b) in that CARDINALE seeks both a collective action under the FLSA and a class action under the Illinois wage laws.

32.     Venue of this Court is involved pursuant to 28 U.S.C. § 1391 (a) in that the DEFENDANTS all reside in this jurisdictional district.

33.     Venue of this Court is invoked pursuant to 28 U.S.C. § 1391 (b) in that as Defendant VALKRE is located in this jurisdictional district, the acts complained of

occurred in this jurisdictional district.

**FACTS**

34.     CARDINALE worked for DEFENDANTS from April 18, 2011 through March, 2015 (three years, 11 months).

35.     CARDINALE was hired by DEFENDANTS as an "Account Manager," with Restrictive Stock and Equity Agreements Attached which was signed in April of 2011, but which memorialized the agreement under which CARDINALE was hired by DEFENDANTS on April 18, 2011. A copy of the Agreement is attached as Exhibit A.

36.     As an "Account Manager," he was to report to a Vice President of the DEFENDANTS, and was to service DEFENDANTS' customers, adopt, and deploy "CVC methodologies and tools within the DEFENDANTS' organization while working for DEFENDANTS.[1]

37.     Throughout the course of CARDINALE'S employment by DEFENDANTS, DEFENDANTS scheduled CARDINALE to work in excess of forty (40) hours per week in one or more individual workweeks.

38.     Throughout the course of CARDINALE'S employment with DEFENDANTS, CARDINALE did work in excess of forty (40) hours per week in one or more individual work weeks.

---

[1] "Customer Value Creation (CVC) is a business strategy aimed at understanding and anticipating the needs of an organization's current and potential customers in an effort to maximize Customer Lifetime Value (CLV). From a marketing technology standpoint, CVC involves the consolidation of all internally and externally acquired customer-related data in a central database, analyzing the consolidated data and using this information in all forms of customer interactions and offers. Use of customer lifetime value as a marketing metric tends to place greater emphasis on long-term customer satisfaction, retention, and growth rather than on maximizing short-term sales." Herrington, Dean, Jr., *Customer Value Creation: Leading Edge Practices for Customer Analytics and Personalization,* www.CRMuniversityinc.com (2015).

39. In the ten (10) years prior to CARDINALE filing this lawsuit, other members of the putative class employed by DEFENDANTS, also worked in excess of forty (40) hours per week in one or more individual work weeks.

40. Although DEFENDANTS schedule CARDINALE and all those similarly situated to work in excess of forty (40) hours per week, DEFENDANTS did not pay CARDINALE overtime wages at a rate of one-and-one-half his regular hourly rate of pay for all hours worked in excess of forty (40) hours.

41. Instead, effective January, 2014, DEFENDANTS arbitrarily cut the pay of CARDINALE and all those similarly situated 33% less than the originally agreed upon rate of pay in DEFENDANTS' original agreement with CARDINALE and all those similarly situated which was a base pay per year plus commission.

42. The original deal that DEFENDANTS made with CARDINALE was to pay him $150,000 a year plus commission.

43. The arbitrary reduction cut his pay to $100,000 a year plus commission.

44. This arbitrary reduction was not agreed to by CARDINALE and was not backed by consideration.

45. The other members of the putative class did not agree to similar arbitrary reductions in January of 2014 in their pay.

46. Their reductions were not backed by adequate consideration.

47. Under the original deal with CARDINALE agreed to, his effective base pay rate was $72.12 per hour for a 40-hour week.

48. His base pay under the arbitrary reduction in January of 2014, was

reduced to $48.07 per hour for a 40-hour week.

49.     In addition, a commission structure was added to it where he was to receive 10% on Sales and 20% on New Software and any new services.

50.     While some of CARDINALE'S job involved sales, and some involved outside travel, he was not employed by DEFENDANTS in the capacity of an outside salesperson.

51.     CARDINALE was not an "employee . . . [w]hose primary duty [was] . . . making sales within the meaning of [Section 203(k)]." 29 C.F.R. § 541.500(a)(1)-(2).

52.     He was not "customarily and regularly engaged away from the employer's place or places of business in performing [sales alone as his] primary duty." 29 C.F.R. § 541.500(a)(1)-(2).

53.     Nor did his work outside the office fall within the "promotion work" exemption in that it did not "primarily" or exclusively consist of promotion work related to sales work performed  him and no others. 29 C.F.R. § 541.500(a)(1)-(2).

54.     While some of CARDINALE'S work involved travel,  the purpose of the trips was to service the clients, meet with them in person and deal with their needs.

55.     If an opportunity came up during these trips he would run with it, but often ideas discussed were developed later when CARDINALE was back home at the office and supported by the home office staff.

56.     Sometimes on the trips, CARDINALE would introduce himself to new clients or customers or would work out new arrangements for existing clients with potential new clients but the purpose of the trips was not in-person selling.

57.     DEFENDANTS did not hire CARDINALE for his selling experience; CARDINALE was hired to be an account representative.

58.     DEFENDANTS did not train CARDINALE how to sell.

59.     He worked outside the office with direct supervision from the home office and was required to report to headquarters on a regular basis while on these trips to advise the DEFENDANTS what was going on.

60.     All similarly situated putative class members were treated the same way as CARDINALE and had the same essential job duties and responsibilities.

61.     In 2014, DEFENDANTS wrongfully failed to pay CARDINALE $50,000 in straight time wages and compensation owed under the agreed upon wage compensation plan CARDINALE was hired under on April 18, 2011 which was memorialized in April 2011, as noted in Exhibit A.

62.     DEFENDANTS thus failed to pay CARDINALE straight wages of $18,108.96 in 2015.

63.     At the end of March 2015 until CARDINALE quit.

64.     CARDINALE regularly worked in excess of 40 hours a week, most weeks working between 60-70 hours per week.

65.     He often communicated with ALDERMAN and others during off hours and on the weekends.

66.     DEFENDANTS owe CARDINALE an average of 20 hours of overtime per week for all weeks worked consisting of a straight time rate of $72.12 per hour or an overtime rate of one-and-one-half times that rate or $108.18 per hour.

67. Based on 20 hours per week or an overtime rate of $2,163.60 per week times 3 years and 11.5 months, or 208 weeks, or a total of $449,904 in unpaid overtime.

68. DEFENDANTS did the same with all others similarly situated.

69. DEFENDANTS' failure to pay also breached the contract of employment agreed upon with CARDINALE in which ALDERMAN agreed to pay CARDINALE $150,000 a year unless terminated. See Exhibit A.

70. CARDINALE never agreed to alter the terms of this agreement.

71. ALDERMAN'S unilateral alteration of the agreement was without consideration.

72. In addition to the above, DEFENDANTS never reimbursed CARDINALE for expenses totaling $18,268 in 2014.

73. Despite repeated requests for payment of wages owed DEFENDANTS have not resolved this matter.

**COUNT I**
**Violation of the FLSA – Failure to Pay Proper Wages**

74. CARDINALE and all those similarly situated hereby re-allege and incorporates paragraphs 1 through 73, as if fully set forth herein.

75. DEFENDANTS in April of 2011 entered into an Agreement with CARDINALE in which they agreed to pay him compensation for $150,000 a year plus incentive and restricted stock and a bonus.

76. This is reflected in writing as Exhibit A, which was signed in April of 2011 by the parties.

77.     In January of 2014, without adequate consideration, without negotiating with CARDINALE or anyone else, Defendant ALDERMAN, unilaterally changed the terms and conditions of employment, changing CARDINALE'S employment terms to $100,000 base, plus 10% commissions on sales business and 20% commissions on the sale on new software and any services.

78.     This changed the terms of the original deal without CARDINALE'S consent.

79.     ALDERMAN did the same thing to all the rest of the Account Representatives.

80.     This violated both the FLSA as CARDINDALE and the putative class members all were promised full salary compensation.

81.     As a result thereof, CARDINALE lost $50,000 in guaranteed income for calendar year 2014 and the members of the putative class lost similar amounts.

82.     In addition in CARDINALE'S case, DEFENDANTS also failed to pay him $33,650 in commissions owed him under this formula.

83.     In 2015, ALDERMAN unilaterally changed the formula again and put CARDINALE and all others similarly situated on a 100% commission basis.

84.     This led CARDINALE to quit in March of 2015.

85.     In addition, at this point, DEFENDANTS refused to reimburse CARDINALE for expenses he incurred for business purposes in accordance with DEFENDANTS' policies, totaling $18,268 for 2014.

86.     CARDINALE was entitled to be reimbursed for these expenses.

87.    Pursuant to 29 U.S.C. § 206(a) and (e), CARDINALE and other similarly situated employees were entitled to be compensated proper regular rates for hours worked straight time in addition to the overtime they were not paid for as discussed above.

88.    By unilaterally changing the compensation terms without consideration and without agreement, DEFENDANTS' failed to pay proper straight time wages in one or more individual work-weeks worked by CARDINALE and all those similar situated from January 2014 through the date CARDINALE ceased working for DEFENDANTS, in violation of 29 U.S.C. § 206(a).

WHEREFORE, CARDINALE and all those similarly situated pray for a judgment against DEFENDANTS as follows:

A.    A judgment under the FLSA in the amount of the unpaid and owed regular rate wages due the CARDINALE individually and all those similarly situated past and present, known and unknown at their unpaid and owed regular rate of pay for all hours worked pursuant to 29 U.S.C. § 207(a) and (e) and 29 U.S.C. § 216(b);

B.    Reasonable attorneys' fees and costs as provided by, 29 U.S.C. § 216 (b);

C.    Costs as provided by the Federal Rules, specifically under Fed.R.Civ.P 54;

D.    Pre-judgment and post-judgment interest and

E.    Such other and further relief as this Court deems appropriate and just.

## COUNT II
### Violation of the FLSA – Overtime Wages

CARDINALE and all those similarly situated hereby re-allege and incorporates paragraphs 1 through 88, as if fully set forth herein.

89.     This count arises from DEFENDANTS' violation of the FLSA, in failing to pay CARDINALE, and all those similarly situated, past and present, for all time worked in excess of forty (40) hours in individual work-weeks.

90.     In one or more individual work-weeks, CARDINALE and all those similarly situated worked in excess of forty (40) hours per week.

91.     It was DEFENDANTS' pattern to expect CARDINALE and all those similarly situated to work 60-70 hour work-weeks without any additional compensation.

92.     CARDINALE and members of the putative class routinely worked in excess of eight hour days to do the work required of them, and in excess of forty (40) hours a week in specific work-weeks, but DEFENDANTS failed to pay CARDINALE and all those similarly situated at one and one-half times their regular rate of pay for time worked in excess of forty (40) hours per week in specific work-weeks.

93.     Pursuant to 29 U.S.C. §§ 206 and 207, CARDINALE and other similarly situated employees were entitled to be compensated at rate of one and one-half times their regular hourly rate of pay for all time worked in excess of eight hours per day and forty (40) hours in individual work weeks.

WHEREFORE, CARDINALE and all those similarly situated pray for a judgment against DEFENDANTS as follows:

A.      A judgment under the FLSA for overtime wages due CARDINALE individually at one-and-one-half times his regular rate for all hours of overtime worked and a judgment under the FLSA for overtime wages due all those similarly situated past and present, known and unknown at one-and-one-times their regular rate for all hours of overtime worked pursuant to 29 U.S.C. § 207(a) and (g) and 29 U.S.C. § 216(b);

B.     Reasonable attorneys' fees and costs as provided by, 29 U.S.C. § 216 (b);

C.     Costs as provided by the Federal Rules, specifically under Fed.R.Civ.P 54;

D.     Pre-judgment and post-judgment interest, and;

E.     Such other and further relief as this Court deems appropriate and just.

## COUNT III
### Violation of the FLSA- Willful

CARDINALE and all those similarly situated hereby re-allege and incorporates paragraphs 1 through 93, as if fully set forth herein.

94.     This count arises from 29 U.S.C. § 216 (b) which provides that any employer who violates the provisions of section 206 or section 207 of the Act shall be liable to the employee or employees affected in the amount of their unpaid wages, and or their unpaid overtime compensation, and in an additional equal amount as liquidated damages.

95.     Any employer who violates the provisions relating to the payment of wages lost shall pay an additional equal amount as liquidated damages. 29 U.S.C. § 216 (b).

96.     CARDINALE believes the evidence will show that the DEFENDANTS new about the FLSA was in the picture and was aware of the Act's possible application to its employees.

97.     As DEFENDANTS knew or showed reckless disregard for their obligations under the FLSA, their conduct as described above was willful as defined by 29 U.S.C. § 216 (b).

WHEREFORE, CARDINALE and all those similarly situated pray for a judgment against DEFENDANTS as follows:

A.     A judgment under the FLSA for liquidated damages under 29 U.S.C. § 216(b);

B.     Reasonable attorneys' fees and costs as provided by, 29 U.S.C. § 216 (b);

C.     Costs as provided by the Federal Rules, specifically under Fed.R.Civ.P 54;

D.     Such other and further relief as this Court deems appropriate and just.

## COUNT IV
### Violation of the IMWL and IWPCA – Failure to Pay Proper Wages

CARDINALE and all those similarly situated hereby re-allege and incorporates paragraphs 1 through 97, as if fully set forth herein.

98.     DEFENDANTS in March of 2011 entered into an Agreement with CARDINALE in which they agreed to pay him compensation for $150,000 a year plus incentive and restricted stock and a bonus.

99.     This is reflected in writing as Exhibit A, which was signed in April of 2011 by the parties.

100.     In January of 2014, without adequate consideration, without negotiating with CARDINALE or anyone else, Defendant ALDERMAN, unilaterally changed the terms and conditions of employment, changing CARDINALE'S employment terms to $100,000 base, plus 10% commissions on sales business and 20% commissions on the sale of new software and any services.

101.     This changed the terms of the original deal without CARDINALE'S consent.

13N2159 (12760.2)                                    - 17 -

102.    ALDERMAN did the same thing to all the rest of the Account Representatives.

103.    This violated both the IMWL 820 ILCS 105/4, 4a and 12(a) and the IWPCA 820 ILCS 115/14(a) and (c), as CARDINDALE and the putative class members all were promised full salary compensation.

104.    As a result thereof, CARDINALE lost $50,000 in guaranteed income for calendar year 2014 and the members of the putative class lost similar amounts.

105.    In addition in CARDINALE'S case, DEFENDANTS also failed to pay him $33,650 in commissions owed him under this formula.

106.    In 2015, ALDERMAN unilaterally changed the formula again and put CARDINALE and all others similarly situated on a 100% commission basis.

107.    This led CARDINALE to quit in March of 2015.

108.    By unilaterally, without consideration and without agreement, changing the compensation structure with CARDINALE and all others similarly situated, DEFENDANTS' failed to pay proper straight time wages in one or more individual work-weeks worked by CARDINALE and all those similar situated over the period of time from January 2014 through the date CARDINALE ceased working for DEFENDANTS in March of 2015.

109.    In addition, DEFENDANTS refused to reimburse CARDINALE for expenses he incurred for business purposes in accordance with DEFENDANTS' policies, totaling $18,268 for 2014.

110.    CARDINALE is entitled to be reimbursed for these expenses.

111.    CARDINALE and other similarly situated employees were entitled to be compensated proper hourly rates for hours worked straight time in addition to the overtime they were not paid for as discussed above, pursuant to IMWL 820 ILCS 105/4, 4a and 12(a) and the IWPCA 820 ILCS 115/14(a) and (c).

WHEREFORE, CARDINALE and all those similarly situated pray for a judgment against DEFENDANTS as follows:

A.    A judgment under the IMWL in the amount of the unpaid overtime hourly wages due the CARDINALE individually and all those similarly situated past and present, known and unknown at their regular rate of pay for all hours worked and not properly paid pursuant to 820 ILCS 105/4 and 4a;

B.    Penalties on that amount pursuant to the formula set forth in 820 ILCS 105/12(a) and 820 ILCS 115/14(a) of 2% per month for each month unpaid wages are due;

C.    Pre-judgment and post-judgment interest (*In Re Air Crash Disaster,* 480 F.Supp. 1280 (N.D. Ill. 1979), *aff'd,* 644 F.2d 633 (7th Cir. 1981));

D.    Reasonable attorneys' fees as provided by, 820 ILCS 115/14(a) and (c), 820 ILCS 105/12(a) and 705 ILCS 225/1;

E.    Costs incurred in filing this action as provided by, 820 ILCS 115/14(a) and (c), 820 ILCS 105/12(a) and 705 ILCS 225/1; and

F.    Such other and further relief as this Court deems appropriate and just.

### COUNT V
### Violation of the IMWL and IWPCA – Overtime Wages

CARDINALE and all those similarly situated hereby re-allege and incorporates paragraphs 1 through 111, as if fully set forth herein.

112.    This Court has supplemental jurisdiction over the matters alleged herein pursuant to 28 U.S.C. §1367.

113.    The matters set forth in this Count arise from DEFENDANTS' violation of the overtime compensation provisions of the IMWL, 820 ILCS 105/4a.

114.    Pursuant to 820 ILCS 105/4a, for all weeks during which CARDINALE and all those similarly situated worked in excess of an eight hour day or in excess of forty (40) hours in an individual work-week, CARDINALE and all those similarly situated are entitled to be compensated at one and one-half times their regular hourly rate of pay.

115.    Pursuant to 820 ILCS 105/12(a), CARDINALE and all those similarly situated are entitled to recover unpaid overtime wages for up to ten years prior to the filing of this suit, plus punitive damages in the amount of two percent (2%) per month of the amount of the underpayments.

WHEREFORE, CARDINALE and all those similarly situated pray for a judgment against DEFENDANTS as follows:

A.    A judgment under the IMWL in the amount of the unpaid overtime hourly wages due the CARDINALE individually and all those similarly situated past and present, known and unknown at their regular rate of pay times time-and-a-half for all overtime hours worked pursuant to 820 ILCS 105/4 and 4a;

B.    Penalties on that amount pursuant to the formula set forth in 820 ILCS 105/12(a) and 820 ILCS 115/14(a) of 2% per month for each month unpaid wages are due;

C.    Pre-judgment and post-judgment interest (*In Re Air Crash Disaster,* 480 F.Supp. 1280 (N.D. Ill. 1979), *aff'd,* 644 F.2d 633 (7th Cir. 1981));

D.    Reasonable attorneys' fees as provided by, 820 ILCS 115/14(a) and (c), 820 ILCS 105/12(a) and 705 ILCS 225/1;

E.    Costs incurred in filing this action as provided by, 820 ILCS 115/14(a) and (c), 820 ILCS 105/12(a) and 705 ILCS 225/1;

F.      Such other and further relief as this Court deems appropriate and just.

## COUNT VI
## Breach of Contract – Illinois Law

CARDINALE and all those similarly situated hereby re-allege and incorporates paragraphs 1 through 115, as if fully set forth herein.

116.    This Court has supplemental jurisdiction over the matters alleged herein pursuant to 28 U.S.C. §1367.

117.    In April of 2011, the DEFENDANTS and CARDINALE entered into a contract of employment. Exhibit A.

118.    This was a contract of employment terminable at will.

119.    This contract was fully supported by a meeting of the minds, agreement of the parties and consideration and it was signed by both parties including the party to be charged, DEFENDANTS VALKRE and JERRY ALDERMAN individually (see last page of Exhibit A).

120.    Under the terms and conditions of this Agreement, CARDINALE was to receive $150,000 per year plus bonus.

121.    In 2014, his pay was unilaterally reduced without negotiations, without the agreement of CARDINALE and without his consent.

122.    The reduction was accomplished not by a new written agreement but by an oral pronouncement by DEFENDANT ALDERMAN.

123.    This this new compensation schedule did not meet the terms and conditions of a new contract.

124. Lacking the elements necessary to form a new contract and in the absence of any written repudiation of the old existing contract, the old Agreement remained in place.

125. To the extent that the attempted oral modification did end the earlier agreement in DEFENDANTS' way of thinking, at that point with CARDINALE continuing to work, DEFENDANTS began breaching the contract and owing him money.

126. The breach became even more acute when ALDERMAN attempted to place CARDINALE on a commission only compensation schedule.

127. In 2014 no bonus was paid.

128. In 2015 no bonus was paid.

WHEREFORE, CARDINALE prays for judgment against DEFENDANTS for the following damages:

A. Compensatory damages in a monetary amount to compensate CARDINALE for losses he sustained as result of DEFENDANTS' breach in the following particulars:

1. Expectation damages in the amount of what CARDINALE should have gotten in wages and bonuses plus reimbursement of his expenses had the original contract been honored, from March of 2011 through April of 2015;

2. Consequential damages to reimburse CARDINALE for all indirect damages other than contractual loss including all lost wages suffered until he was made whole again after he left DEFENDANTS' employ until he was making a wage at or exceeding what he would have made had DEFENDANTS honored their original contract with him through the date he became whole after leaving DEFENDANT employ;

B. Punitive damages to punish DEFENDANTS for breaching their contract with CARDINALE and to them from committing any future breaches of like kind with other employees;

C.  Grant such other and further relief as the court deems fit.

## **JURY TRIAL DEMANDED**

CARDINALE demand trial by jury on all issues properly tried by jury.


Respectfully Submitted,

MICHAEL CARDINALE


/s/  L. Steven Platt

L. Steven Platt
ROBBINS, SALOMON & PATT, LTD
180 N. LaSalle, Suite 3300
Chicago IL 60601
(312) 456-0285
lsplatt@rsplaw.com

EXHIBIT A

1/3

**VALKRE SOLUTIONS, INC.**
**April 1, 2011**

Michael Cardinale
438 West Oakdale
Chicago, IL 60657

Dear Michael:

Valkre Solutions, Inc., a Delaware corporation (the "Company"), is pleased to offer you employment with the Company on the terms described below.

1.  **Position.** You will start in a full-time position as Account Manager and you will initially report to the Company's Vice President of Services. Your primary duties will be servicing Valkre's customers in the adoption and deployment of CVC methodologies and tools within their organization. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties with the Company.

2.  **Compensation and Employee Benefits.** You will be paid a starting salary of $150,000 per year, payable on the Company's regular payroll dates. [As a regular employee of the Company you will be eligible to participate in a number of Company-sponsored benefits, which are described in the employee benefit summary enclosed with this letter.]

3.  **Confidential Information and Invention Assignment Agreement.** Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's enclosed standard Confidential Information and Invention Assignment Agreement.

4.  **Employment Relationship.** Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Chief Executive Officer.

5.  **Outside Activities.** While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company. In addition, while you render services to the company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

6.  **Withholding Taxes.** All forms of compensation referred to in this letter are subject to applicable withholding and payroll taxes.

7.  **Entire Agreement.** This letter supersedes and replaces any prior understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter.

2/3

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter and the enclosed Confidential Information and Invention Assignment Agreement and return them to me. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States.

Very truly yours,

VALKRE SOLUTIONS, INC.

By:_____
(Signature)

Name: Jeff Navach
Title: Vice President of Services

ACCEPTED AND AGREED:

_____
(PRINT EMPLOYEE NAME)

_____
(Signature)

_____
Date

Anticipated Start Date:_____

Attachment A: Confidential Information and Invention Assignment Agreement

EAST-42649950.1

3|3

## ATTACHMENT A

### CONFIDENTIAL INFORMATION AND
### INVENTION ASSIGNMENT AGREEMENT

*(See Attached)*

1/4

## VALKRE SOLUTIONS, INC.
## RESTRICTED STOCK AGREEMENT

**THIS RESTRICTED STOCK AGREEMENT** (this "Agreement") is executed as of December 22, 2011 (the "Effective Date"), by and between Valkre Solutions, Inc., a Delaware corporation (the "Corporation"), and Mike Cardinale (the "Stockholder").

**WHEREAS**, the Corporation has agreed to compensate the Stockholder for his performance of services by transferring to him 15,000 shares of Common Stock of the Corporation, $0.001 par value (the "Stock"), subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Recitals.** The foregoing recitals are made a part of this Agreement.

2.    **Issuance of Stock.** The Corporation hereby issues the Stock to the Stockholder subject to all terms and conditions set forth herein.

3.    **Stock Restrictions.** The Stock shall be nontransferable and subject to forfeiture until such shares vest in accordance with the schedule set forth in **Schedule A** (hereinafter referred to as the "Restriction Period"); *provided, however*, that in order for any portion of such Stock to vest, the Stockholder shall have been in the continuous employ of the Corporation from the Effective Date through the specified vesting date. Upon any vesting of any portion of the Stock by virtue of the lapse of the restriction period set forth in **Schedule A** or under Section 5 of this Agreement, upon request of the Stockholder, the Corporation agrees to deliver to the Stockholder (or his estate, as may be applicable) a stock certificate covering the requisite number of vested shares registered on the Corporation's books in the name of the Stockholder within thirty (30) days after vesting upon receipt of the existing certificate and to remove the legend regarding forfeiture as to such vested shares. Any such stock certificate shall not include vested fractional shares. Upon receipt of such stock certificate, such Stockholder is free to hold or dispose of such certificate at will, subject to Section 9 and any applicable securities laws or regulations governing transferability of shares of the Corporation. Failure of the Stockholder (or his estate, as may be applicable) to deliver a certificate to the Corporation for the removal of the legend shall not affect the vested nature of the affected shares.

During the restriction period, the Stock not already vested is not transferable by the Stockholder by means of sale, assignment, exchange, pledge, hypothecation, or otherwise (other than by will or the laws of descent and distribution).

Notwithstanding anything to the contrary set forth herein, the restrictions set forth in this Section 3 and in Section 5 herein shall lapse and the Stock shall become fully vested upon (i) the closing of an underwritten public offering by the Corporation of its common stock or any other equity securities pursuant to an effective registration statement under the Securities Act; (ii) a sale of all or substantially all of the assets of the Corporation; (iii) a sale of the Corporation as a result of which more than fifty percent (50%) of the total number of outstanding shares of its equity securities is sold, exchanged, conveyed, or otherwise transferred to a third party in one or a series of related transactions; or (iv) a merger or consolidation of the Corporation as a result of which the holders of its equity securities (immediately prior

2/4

to such merger or consolidation) hold less than fifty percent (50%) of the surviving or new entity as the case may be.

4.    **At-Will Employment.** Nothing in this Agreement shall be construed as constituting a commitment, guarantee, agreement or understanding of any kind or nature that the Corporation shall continue to employ the Stockholder, nor shall this Agreement affect in any way the right of the Corporation to terminate the employment of the Stockholder at any time, for any or no reason. By the Stockholder's execution of this Agreement, such Stockholder acknowledges and agrees that his employment continues to be "at will". No change of the Stockholder's duties as an officer or employee of the Corporation shall result in, or be deemed to be, a modification of the terms of this Section.

5.    **Forfeiture.** Any Stock which have not become vested pursuant to Section 3 or 5 hereof shall be forfeited to the Corporation if the Stockholder's employment or other service with the Corporation is terminated for any reason (or no reason). If the Stock is forfeited, the Stockholder shall assign, transfer, and deliver any evidence of the shares of Stock to the Corporation and cooperate with the Corporation to reflect such forfeiture.

6.    **Withholding Taxes.** The Corporation shall have the right to deduct from any compensation or any other payment of any kind (including withholding the issuance of shares of Common Stock) due the Stockholder the amount of any federal, state or local taxes required by law to be withheld as a result of the grant of the restricted stock award or the lapse of the restriction period in whole or in part; provided, however, that the value of the shares of Common Stock withheld may not exceed the statutory minimum withholding amount required by law. In lieu of such deduction, the Corporation may require the Stockholder to make a cash payment to the Corporation equal to the amount required to be withheld. If the Stockholder does not make such payment when requested by the Corporation, the Corporation may refuse to issue any Common Stock certificate under this Agreement until arrangements satisfactory to the Board for such payment have been made.

7.    **Stock Certificates.** The stock certificate(s) evidencing the Stock shall be registered on the Corporation's books in the name of the Stockholder as of the Effective Date. Physical possession or custody of such stock certificate(s) shall be retained by the Corporation until such time as the shares are vested *(i.e.,* the restriction period lapses) thereafter upon request of the Stockholder and receipt of the existing certificate, the Corporation agrees to deliver a stock certificate covering the requisite number of vested shares registered on the Corporation's books in the name of the Stockholder within thirty (30) days after the vesting and to remove the legend regarding forfeiture as to such vested shares. While in its possession, the Corporation reserves the right to place a legend on the stock certificate(s) restricting transferability of such certificate(s) and referring to the terms and conditions (including forfeiture) approved by the Board and applicable to the shares represented by the certificate(s). The Stockholder shall deliver to the Corporation a stock power, endorsed in blank, a form of which is attached hereto as **Exhibit A**, with respect to the Stock to be held by the Corporation during the restriction period.

During the restriction period, except as otherwise provided in Section 3 of this Agreement, the Stockholder shall be entitled to all rights of a stockholder of the Corporation, including the right to vote the shares and receive dividends and/or other distributions declared on such shares.

8.    **Other Agreements; Legends.** The Stockholder acknowledges and agrees that the Corporation has entered into this Agreement and has agreed to issue the Stock hereunder on the express condition that the Stockholder execute and deliver as of this date a counterpart signature page to the Voting Agreement and a Right of First Refusal Agreement, by and among the Corporation and the other

-2-

3/4

## EXHIBIT A

### Stock Power

**FOR VALUE RECEIVED**, the undersigned, _____, an individual residing at _____, hereby sells, assigns and transfers unto Valkre Solutions, Inc. (the "Corporation") or its successor _____ shares of Common Stock of the Corporation standing in my name in the books of the Corporation, represented by Certificate No. _____, which is attached hereto, and hereby irrevocably constitutes and appoints Jerry Alderman as my attorney-in-fact to transfer the said stock on the books of the Corporation with full power of substitution in the premises.

NAME: MIKE CARDINALE

DATED: _12/23/2011_

3

4/4

**IN WITNESS WHEREOF**, the Corporation has caused this Agreement to be executed by its duly authorized representative, and the Stockholder has executed this Agreement, each as of the date first above written.

**VALKRE SOLUTIONS, INC.**

BY:

Name: Jerry Alderman
Title: Chairman of the Board and Chief Executive Officer

**STOCKHOLDER**

Name: Mike Cardinale

1/5

**VALKRE SOLUTIONS, INC.**
**EQUITY INCENTIVE PLAN**

**INCENTIVE STOCK OPTION GRANT AGREEMENT**

**THIS GRANT AGREEMENT** (this "Agreement") is entered into by and between Valkre Solutions, Inc. (the "Corporation") and Michael Cardinale, the ("Grantee") effective as of January 1, 2014 (the "Grant Date").

1.   **GRANT OF OPTION**

Subject to the provisions of this Agreement, and pursuant to the provisions of the Valkre Solutions, Inc. Equity Incentive Plan (the "Plan"), the Corporation hereby grants to Grantee, as of the Grant Date, an option (the "Option") of such type, to purchase such number of shares of Common Stock of the Corporation (the "Shares"), and at such exercise price per Share (the "Option Price") as are stated in the Stock Option Overview below. The Option terminates on the earlier of (a) the date set forth in Section 4 upon a termination of employment of the Grantee with the Corporation or any Parent or Subsidiary of the Corporation or (b) the end of the Option Term stated in the Overview.

---

STOCK OPTION OVERVIEW

Type of Option: Incentive Stock Option

Number of Shares Subject to the Option: 30,000

Option Price: $1.50 per Share, which amount is the Fair Market Value of each Share as of the Grant Date, as determined by the Corporation's Board of Directors in accordance with the Plan.

Option Term: 3 years

---

2.   **VESTING**

(a)   **Vesting Schedule**. The Option shall become vested and exercisable in accordance with the applicable vesting schedule specified below.

(i)   *Regular Schedule*: The Option shall become vested and exercisable as follows: 2,500 shares per quarter until 30,000 are fully vested on Dec 31, 2016.

(ii)   *Accelerated Vesting Schedule*: The Option shall become One Hundred Percent (100%) vested and exercisable upon a Change in Control of the

2/5

Corporation, provided Grantee has continued in the employment of the Corporation or any Parent or Subsidiary of the Corporation from the Grant Date through the date of such a Change in Control.

## 3. EXERCISE OF OPTION AND ISSUANCE OF SHARES

(a)     **Exercisability of Option**.  No portion of the Option granted to Grantee shall be exercisable by Grantee prior to the time such portion of the Option has vested.

(b)     **Manner of Exercise**.  The vested portion of the Option may be exercised, in whole or in part, by delivering written notice to the Committee or its designee in such form as the Committee may require from time to time.  Such notice shall specify the number of Shares Grantee then desires to purchase, subject to any minimum exercise threshold established by the Committee, and the manner of payment of the Option Price. The Option may be exercised only in multiples of whole Shares and no partial Shares shall be issued.

(c)     **Manner of Payment of Option Price**.  Unless the Committee in its sole discretion allows or requires payment by another means, the Option Price may be paid by any of the following means:

(i)     By a check payable to the order of the Corporation for an amount in U.S. dollars equal to the Option Price of such Shares.

(ii)     By transfer of Shares having an aggregate Fair Market Value equal to such Option Price which have been held by Grantee for at least six (6) months, or a combination of cash and such Shares.

(iii)     After an IPO of the Shares, by a broker-assisted "cashless exercise" procedure, as permitted under Federal Reserve Board's Regulation T, subject to securities law restrictions.

(iv)     By such other means as the Committee in its sole discretion shall permit.

(d)     **Issuance of Shares**.  Upon exercise of the Option, in whole or in part, in accordance with the terms of this Agreement and upon payment of the Option Price for the Shares as to which the Option is exercised, and any applicable tax withholding, the Corporation shall issue to Grantee or, in the event of Grantee's death, to Grantee's executor, personal representative or the person to whom the Option shall have been transferred by will or the laws of descent and distribution, as the case may be, a certificate or certificates or evidence of book entry Shares registered in Grantee's name for the number of Shares so paid for. Any share certificates for the Shares issued hereunder shall, unless such shares are registered or an exemption from registration is available under

applicable federal and state securities laws, bear a legend restricting transferability of such shares.

(e) **No Rights of Shareholder.** Grantee shall not have any of the rights of a shareholder with respect to the Shares that may be issued upon the exercise of the Option until such Shares have been issued to him or her upon the due exercise of the Option.

(f) **Nontransferability of Option**. The Option shall be nontransferable otherwise than by will or the laws of descent and distribution. During the lifetime of Grantee, the Option may be exercised only by Grantee or, during the period Grantee is under a legal disability, by Grantee's guardian or legal representative.

(g) **Securities Regulations.** In the event the Shares that may be purchased under the Option are not registered under the Securities Act of 1933, as amended (the "Securities Act"), the exercise notice shall include the following representations by Grantee:

(i) Grantee is acquiring the Shares for his or her own account for investment with no present intention of dividing the interest with others or of reselling or otherwise disposing of any of the Shares.

(ii) The Shares are being issued without registration under the Securities Act.

(iii) Since the Shares have not been registered under the Act, they must be held indefinitely until an exemption from the registration requirements of the Act is available or they are subsequently registered, in which event the representation in Paragraph (i) hereof shall terminate. As a condition to any transfer of the Shares, Grantee understands that the Corporation will require an opinion of counsel satisfactory to the Corporation to the effect that such transfer does not require registration under the Act or any state securities law.

(iv) The issuer is not obligated to comply with the registration requirements of the Act or with the requirements for an exemption under Regulation A under the Act for Grantee's benefit.

(v) The certificates for the Shares to be issued to Grantee shall contain appropriate legends to reflect the restrictions on transferability imposed by the Act.

(h) **Binding Agreements**. As a condition to exercise of the Option, the Grantee agrees that any Shares issued under this Grant Agreement are subject to the Valkre Solutions, Inc. Voting Agreement, dated December 31, 2011, as amended from time to time, and the Valkre Solutions, Inc. Amended and Restated Right of First Refusal Agreement, dated November 30, 2010, as amaended from time to time, and Grantee shall

-3-

4/5

execute such documentation provided by the Corporation to evidence Grantee's consent to be bound by such agreements.

## 4.   TERMINATION OF EMPLOYMENT

(a)   **Unvested Portion.** The unvested portion of the Option shall terminate, and no longer be of any force or effect, upon the earlier of (a) the end of the Option Term or (b) the termination of Grantee's employment with the Corporation or any Parent or Subsidiary of the Corporation for any reason.

(b)   **Vested Portion.** The vested portion of the Option shall terminate, and no longer be of any force or effect, upon the earlier of (a) the end of the Option Term or (b) the applicable date below following termination of Grantee's employment with the Corporation or any Parent or Subsidiary of the Corporation:

(i)   at the time of   termination of Grantee's employment by the Corporation for "Cause" or by resignation of the Grantee; or

(ii)   three (3) months following termination of Grantee's employment for any other reason.

(c)   **"Cause" Defined.** For purposes of this Agreement, "Cause" means (A) the substantial failure to perform the duties of Grantee's position with the Corporation or any Parent or Subsidiary, (B) willful misconduct or gross negligence, (C) conviction of a felony, (D) commission of an act against the Corporation which constitutes misappropriation, embezzlement, or fraud, or (E) violation of any agreement with or policy of the Corporation or any Parent or Subsidiary concerning confidentiality, noncompetition, or ownership of inventions or intellectual or other property.

## 5.   MISCELLANEOUS

(a)   **Withholding of Taxes**. The Corporation or any Parent or Subsidiary of the Corporation shall have the right to deduct from any compensation or any other payment of any kind (including withholding the issuance of Shares) due Grantee the amount of any federal, state or local taxes required by law to be withheld as the result of the exercise of the Option or the sale of Shares issued thereunder.   In lieu of such deduction, the Committee may require Grantee to make a cash payment to the Corporation or any Parent or Subsidiary of the Corporation equal to the amount required to be withheld. If Grantee does not make such payment when requested, the Corporation may refuse to issue any Shares under the Plan until arrangements satisfactory to the Committee for such payment have been made.

(b)   **No Right to Continued Employment.** Nothing in the Plan or this Agreement shall be construed as a contract of employment between the Corporation or any Parent or Subsidiary of the Corporation and the Grantee, or as a contractual right of the

-4-

BA3 – 498975

Grantee to continue in the employ of the Corporation or any Parent or Subsidiary of the Corporation, or as a limitation of the right of the Corporation or any Parent or Subsidiary of the Corporation to discharge the Grantee at any time.

(c) **Prevailing Laws.** This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Illinois, without regard to its conflict of laws rules and principles.

(d) **Headings**. The headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(e) **Successors.** This Agreement shall be binding upon and inure to the benefit of the successors, assigns and heirs of the respective parties.

(f) **Notices**. All notices and other communications made or given pursuant to this Agreement shall be in writing and shall be sufficiently made or given if hand delivered or mailed by certified mail, addressed to Grantee at the address contained in the records of the Corporation, or addressed to the Committee, care of the Corporation for the attention of its Secretary at its principal office or, if the receiving party consents in advance, transmitted and received via telecopy or via such other electronic transmission mechanism as may be available to the parties.

(g) **Entire Agreement; Modification**. This Agreement and the Plan contain the entire agreement between the parties with respect to the subject matter contained herein and may not be modified, except as provided in the Plan or in a written document signed by each of the parties hereto.

(h) **Conformity with Plan**. This Agreement is intended to conform in all respects with, and is subject to all applicable provisions of, the Plan, which is incorporated herein by reference. Unless stated otherwise herein, capitalized terms in this Agreement shall have the same meaning as defined in the Plan. Inconsistencies between this Agreement and the Plan shall be resolved in accordance with the terms of the Plan. In the event of any ambiguity in this Agreement or any matters as to which this Agreement is silent, the Plan shall govern including, without limitation, the provisions thereof pursuant to which the Committee has the power, among others, to (i) interpret the Plan and Grant Agreements related thereto, (ii) prescribe, amend and rescind rules and regulations relating to the Plan, and (iii) make all other determinations deemed necessary or advisable for the administration of the Plan. The Grantee acknowledges by signing this Agreement that he or she has received and reviewed a copy of the Plan.

-5-

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

VALKRE SOLUTIONS, INC.

By: _____

Grantee _____

-6-

BA3 – 498975

**Exhibit B**

## CONSENT TO BECOME A PARTY PLAINTIFF

*Michael Cardinale and all those similarly situated v. Valkre*
*Solutions, Inc., and Jerry Alderman*

ATTN: VALKRE SOLUTIONS, INC., UNPAID WAGES ACTION
Robbins, Salomon & Patt, Ltd. 180 N. Michigan, Suite 3300
Chicago IL 60601
Fax to: (312) 782-6690
lsplatt@rsplaw.com

By signing below, I state that I have been employed by Valkre Solutions, Inc., and or Jerry Alderman or a company associated with Valkre Solutions, Inc., or company run or owned by Jerry Alderman, in the past ten years, and that I hereby consent to join this lawsuit seeking unpaid wages based on Defendants' violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.,* the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq..* and the Illinois Minimum Wage Act, 820 ILCS 105/1, *et seq.*

I hereby designate attorney L. Steven Platt the law firm of Robbins, Salomon & Patt, Ltd., to represent me and any collective or putative class members for all purposes of this action.

I also designate the Class Representative as my agent to make decisions on my behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with the Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit,

Date: ___5 / 4___, 2017

_____
(Signature)

MICHAEL CARDINALE
_____
(Printed Name)

Statute of limitations concerns mandate that you return
This form as soon as possible to preserve your rights.